IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Case No. 1:22-CR-151 |
| v. | ) |
| | ) The Honorable Patricia T. Giles |
| JONATHAN PETER MILLER, | ) |
| | ) Sentencing: February 23, 2023 |
| *Defendant.* | ) |
| | ) |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The defendant, Jonathan Peter Miller, comes before the Court for sentencing after pleading guilty to one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1), having been previously convicted of possession of child pornography under the laws of the Commonwealth of Virginia. *See* Dkt. No. 28 (Plea Agreement), ¶ 1; Dkt. No. 29 (Statement of Facts), ¶ 2. The applicable guidelines range for the offense has been correctly calculated in the Presentence Investigation Report ("PSR") as 180-210 months' imprisonment. *See* Dkt No. 34 (PSR), ¶ 120.

The United States respectfully submits, in accordance with the terms of the plea agreement, that a 180-month sentence is sufficient but not greater than necessary to effectuate the statutory sentencing factors under 18 U.S.C § 3553(a). The United States also respectfully requests that the Court impose a substantial term of supervised release, forfeiture of the electronic device used in connection with the offense, and restitution and special assessments as set forth in statute and pursuant to the plea agreement.

I.    **Background**

On April 13, 2022, the defendant had just been released from jail after a parole violation.[1] He was serving three separate terms of supervision—including a term for his 2013 possession of child pornography conviction. *See* PSR ¶ 65-67. Under the terms of his supervision, the defendant could not possess a device capable of accessing the internet without prior authorization from his probation officer and the installation of monitoring software. But that day, unbeknownst to his probation officer, the defendant purchased a Samsung cellular telephone with smartphone capabilities. *See* Dkt. No. 29, ¶ 4. He never registered it. And for nine days—until he was caught—the defendant used that device to access the internet and obtain child sexual abuse material (CSAM).

On April 22, 2022, the defendant's probation officer made an unannounced visit to his residence, where she saw the unregistered device. The defendant admitted that the phone was his and gave the officer consent to search it. Immediately upon opening the phone, the probation officer saw open internet tabs that contained child pornography. She put the phone down and called Fairfax County Police Department (FCPD).

The defendant then spoke to FCPD detectives, who, like the probation officer, observed numerous open internet tabs in Google Chrome—all of which displayed child pornography. The defendant admitted that he was interested in "taboo" pornography and was looking for something

---

[1] This information is reflected in the defendant's "Major Violation Report: Post-Release Supervision," prepared by the Virginia Department of Corrections, and which has previously been provided to defense counsel and to the Probation Office. According to this report, on April 4, 2022, the defendant was arrested due to his continued non-compliance with his conditions, in particular, his use of alcohol and lack of candor with his probation officer. At a Preliminary Parole Hearing on April 12, 2022, probable cause was found that the defendant violated certain conditions. Sanctions were imposed at that time, and he was released.

2

"different."  He admitted to having viewed, and masturbated to, child pornography in the past two weeks.

The defendant's device was subsequently seized and searched pursuant to a warrant.  The forensic analysis revealed the extent of the defendant's actions—his concerted efforts to seek out and receive child pornography onto his device.  The defendant repeatedly used the internet to acquire child pornography, and he used his phone as a repository for his favorite illicit content.  The defendant's phone was replete with child pornography terminology—searches he made, websites he visited—as well as failed attempts to hide his tracks through anonymous internet browsing.  The defendant had more than 60 internet tabs open in the Google Chrome browser, many of which had been open for multiple days on the device.  Each internet tab contained at least one image of child pornography.  The forensic evidence showed that the defendant curated his collection; he closed out the internet tabs he did not like, and he regularly returned to the websites with content he preferred.

One of those websites is titled, in part, "xxx.com."  *See* Dkt. No. 29, ¶ 11.  That web page contained numerous "GIFs"—or short video clips—of pre-pubescent minors, including toddlers, being sexually abused.  Below each GIF was a link to "DOWNLOAD" the full video file.  On April 18, 2022, the defendant accessed that website.  Hours later, he returned to the site, which he had kept open on his phone.  The defendant clicked on the download link underneath one of the GIF video previews, which depicted a nude adult male engaged in sexual intercourse with a nude prepubescent female.  The defendant was directed to another website, where he could either download that video for free (over a few hours) or pay for a "premium" (*i.e.*, quick) download.  Although the defendant never downloaded that full video onto his device, he had accessed 21 other

3

short videos.[2]  And, in a little over a week, he had received 365 child pornography images onto his device (not including the GIFs); these images existed both in the open tabs as well as in the Google Chrome cache, where his phone automatically captured them when he accessed the numerous child pornography websites.  Many of these files depict the violent, sado-masochistic sexual abuse and rape of infants and toddlers, among other prepubescent minors.

## II.     Statutory Minimum and Maximum Penalties

In this case, receipt of child pornography carries a minimum term of 15 years' imprisonment with a maximum term of 40 years' imprisonment.  *See* 18 U.S.C. § 2252(a)(2) and (b)(1); *see* Dkt. No. 29, ¶ 2 (prior conviction under the laws of a State relating to the possession of child pornography).  Following any term of imprisonment, the defendant must be placed on supervised release for a term of at least 5 years up to a lifetime term.  18 U.S.C. § 3583(k).

## III.    Guidelines Calculations

As the Court is aware, although the Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005).  Thus, at sentencing, a court "must first calculate the Guidelines range" applicable to the defendant.  *Nelson v. United States*, 555 U.S. 350, 351 (2009); s*ee also Gall v. United States*, 552 U.S. 38, 49-50 (2007).  Here, the PSR correctly calculated the total offense level for the defendant under the Guidelines as follows:

| Guideline | |
|---|---|
| Base offense level because the defendant was convicted of 18 U.S.C. § 2252(a)(2) (U.S.S.G. § 2G2.2(a)(2)) | 22 |

---

[2] According to the forensic examiner, these short videos had a combined length of 3 minutes, 14 seconds.  *See* PSR ¶ 35.

4

| | |
|---|---|
| Reduction because (A) 2G2.2(a)(2) applies; (B) the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor; and (C) the defendant did not intend to traffic in, or distribute, such material. (U.S.S.G. § 2G2.2(b)(1)) | -2 |
| The material involved a prepubescent minor or a minor who had not attained the age of 12 years. (U.S.S.G. § 2G2.2(b)(2)) | +2 |
| The offense involved a material that portrays sadistic or masochistic conduct or other depictions of violence, or the sexual abuse or exploitation of an infant or toddler. (U.S.S.G. § 2G2.2(b)(4)) | +4 |
| The offense involved the user of a computer or interactive service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material. (U.S.S.G. § 2G2.2(b)(6)) | +2 |
| The offense involved at least 600 images. (U.S.S.G. § 2G2.2(b)(7)(D)) | +5 |
| **TOTAL OFFENSE LEVEL** | 33 |

PSR ¶¶ 43-52. The PSR also properly found that the defendant has clearly demonstrated acceptance of responsibility for this offense and is therefore entitled to a two-level decrease in offense level under U.S.S.G. § 3E.1.1(a). *Id.* ¶ 54. Moreover, the defendant has assisted authorities in the prosecution of his own misconduct by timely notifying the government of his intention to enter a plea of guilty. Accordingly, the government moves for an additional one-level decrease in the offense level pursuant to U.S.S.G. § 3E1.1(b) and the plea agreement. *Id.* ¶ 55.

The defendant's criminal history score is 16, resulting in a Criminal History Category VI. *Id.* ¶ 70. Based on a total offense level of 30 and Criminal History Category VI, the defendant's Guidelines sentencing range is 180-210 months of incarceration. *Id* at Part D.

The defendant has objected to the image count pursuant to U.S.S.G. § 2G2.2(b)(7), arguing that a three-level enhancement under subsection (7)(B) applies (rather than the five-level enhancement pursuant to subsection (7)(D)). The PSR properly determined that the offense

involved 600 or more images. The government's forensic expert prepared a report with attachments and made that evidence available to the defendant as early as August 2022. The government's expert relied upon the images and GIFs contained within the report's attachments to determine the image count in Paragraph 35 of the PSR. To accurately determine the number of images involved in the offense, the government's expert used the Griffeye forensic tool to compile the child-pornography images, and he wrote a computer script specifically to determine the number of child-pornography GIFs received onto the defendant's phone.[3]

To the extent the defendant now challenges the number of GIFs involved in the offense, the defendant agreed, as part of the Statement of Facts, that he accessed at least one website containing "*multiple* different GIFS or animations depicting minors engaged in sexually explicit conduct." *See* Dkt. No. 29, ¶ 11 (emphasis added). Thus, he cannot now argue that only three GIFs were located, and only two of those were positively identified as CSAM.[4]

The defense further objects to the classification of a "GIF" as a video clip and says that, instead, a GIF should be considered a layered image. The government's forensic expert prepared a 3 minute, 14 second video that combines the 22 separate GIFs into one file. As the video makes clear, these GIFs plainly constitute videos or moving pictures.[5] Assuming a GIF constitutes a layered image, however, the government's forensic expert also used Griffeye to separate out the

---

[3] The defendant's expert reviewed the forensic evidence in October 2022, and no report was prepared. Thus, the government is unable to directly address the discrepancy in number of images and GIFs at this time. However, it appears that the discrepancy stems from the government expert's ability to search for and locate a certain type of file (an MHTML file), which contained the vast majority of the GIFs. In order to identify that file type, which is not recognized by Griffeye, the government expert had to write a script to extract the GIFs from the MHTML files.

[4] The government also notes that the defendant agreed, in the Statement of Facts, that over 200 child pornography images were contained in the cache folder and that there were more than 60 open tabs, each containing at least one child pornography image file. Dkt. No. 29, ¶¶ 8, 9.

[5] According to the government's forensic examiner, the sole difference between a GIF and a video is that GIFs lack sound.

layered images or frames within each GIF. In these terms, the 22 GIFs are comprised of 2,203 unique image frames.[6] This information, as well as the 3-minute, 14-second video, has been made available to defense counsel.

In addition, the defendant objects to the purported double counting of certain images. Yet as the defendant recognizes, the Fourth Circuit has held that "any image without regard to its originality should be counted when applying this enhancement so long as that image depicts child pornography and is relevant to the underlying conviction." *United States v. Price*, 711 F.3d 455, 458–59 (4th Cir. 2013). This is due both to the plain language of Application Note 4, as well as the "viral" nature of digital forms of child pornography. *See United States v. Sampson*, 606 F.3d 505, 510 (8th Cir. 2010); *United States v. Sullivan*, 451 F.3d 884, 891 (D.C. Cir. 2006).

In any event, the defendant misconstrues the evidence that forms the basis of the image count and the alleged double counting. As further detailed in the government's forensic report, the defendant's device was replete with images of child pornography—including in open internet tabs, the various cache folders, and the Google Search Widget. However, none of the open tabs were independently included in the government expert's image count.[7] Rather, the images contained in the open tabs were only counted when they were cached by the web browser. These images are all child-pornography files that the defendant knowingly received onto his phone as part of the offense conduct; he knowingly searched for child pornography online, visited websites

---

[6] A GIF, just like a video, typically consists of multiple images that appear in a sequence to create an appearance of motion. Each single image that appears in a GIF is considered as a frame. Each frame in a GIF contains a complete image, and the frames are displayed one after another at a specific interval for a motion effect.

[7] As previously noted, in the Statement of Facts, the parties agreed that "the device contained more than 60 open internet tabs in the Google Chrome application" and that "[e]ach of these open tabs contained at least one image file of child pornography." Dkt. No. 29, ¶ 8.

containing child pornography, and kept those tabs open for multiple days so that he could more easily access the contraband files. Dkt. No. 29, ¶ 8, 11. Contrary to the defendant's assertion, this is not "unknowing duplication" in a cache folder never accessed. The cached images are the residual proof of child pornography knowingly sought out and received—and critical evidence of the defendant's receipt.

Thus, the government submits that the PSR properly calculated the offense as involving over 600 images and a 5-level enhancement is therefore warranted under U.S.S.G. § 2G2.2(b)(7)(D).

## IV. Section 3553(a) Factors

After calculating the Guidelines range, a sentencing court must then consider that range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. As explained below, consideration of these factors suggests that a 180-month sentence, at the bottom of the Guidelines range, is appropriate in this case.[8]

---

[8] As part of the plea agreement, the United States and the defendant also agreed to recommend a sentence of 180 months' imprisonment. *See* PSR ¶ 8.

### A.     The nature, circumstances, and seriousness of the defendant's offense

Child pornography offenses are extraordinarily serious offenses, and certainly are not victimless crimes. As the Supreme Court has recognized, all child pornography crimes "produce[] concrete and devastating harms for real, identifiable victims." *Paroline v. United States*, 572 U.S. 434, 457 (2014). Such crimes inherently involve the sexual abuse of children, even if no new child pornography is produced. *See New York v. Ferber*, 458 U.S. 747, 759 (1982). Trafficking in child pornography is "intrinsically related to the sexual abuse of children in at least two ways." *Id.* First, increased demand for child pornography is associated with increased supply: Far from being victimless, trafficking in child pornography "harms children in part because it drives production [of child pornography], which involves child abuse." *Paroline*, 572 U.S. at 439-40; *see also Ferber*, 458 U.S. at 759 ("[T]he distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled.").

Second, "[i]t is well established that children featured in child pornography are harmed by the continuing dissemination and possession of that pornography. Such images are 'a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.'" *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *Ferber*, 458 U.S. at 759); *accord United States v. Accardi*, 669 F.3d 340, 345 (D.C. Cir. 2012) ("[C]hild pornography creates an indelible record of the children's participation in a traumatizing activity, and the harm to the child is only exacerbated by the circulation of the materials."). "Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *accord United States*

9

*v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters"). These children "must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," and they "suffer a direct and primary emotional harm when another person possesses, receives or distributes the material." *Sherman*, 268 F.3d at 547-48.

Here, through the hundreds of images and video clips of child sexual abuse contained on the defendant's devices, the defendant perpetuated the victimization of countless children whose exploitation is memorialized in those graphic depictions of their abuse.[9] As described in the victim impact statements, the actual children depicted continue to suffer deeply by the defendant's actions—collecting such images and videos and taking a perverse pleasure in the heinous sexual abuse they endured.

For instance, the defendant received an image depicting a minor victim known as "Anna." Anna was repeatedly raped and subjected to other forms of sexual abuse by her biological father when she was a prepubescent minor. As Anna explains in her letters to the court,

> Not only had he abused me but he had allowed others to share in that pleasure he got from abusing me. . . . There are and will be so many people out there taking pleasure in watching me suffer, in watching the most terrifying and humiliating moments of my life. Not knowing who has seen you in your most vulnerable moments is a horrifying thing. . . . I am still vulnerable and exposed. It will never stop. I can't move on. I am helpless to do anything about it. There's a constant feeling of violation, distrust, and anxiety. The extent of my sexual abuse being shared constantly affects my life.

---

[9] Unfortunately, less than 40% of the defendant's victims have been identified. *See* PSR ¶¶ 35,37 (56 series, and 96 image files, containing NCMEC-identified victims, out of 259 unique images).

*See* PSR, at 49.  Although the physical abuse has ended, Anna describes the enduring trauma caused by each defendant who downloads or views her images:

> My past continuously haunts me and is much harder to leave in the past when I know others are still watching.  My childhood was stolen from me, but because there is this record of my abuse, it continues and will forever affect my life in ways words cannot express. My images will probably always be circulating the internet, but this person is perpetuating this. This person chose to view the images of my abuse for their pleasure. By having done this they are allowing and encouraging more young victims to be groomed, they are normalizing the sexualization of children, and they are watching the abuse a non-consenting child had to suffer.

*Id.* at 50.

Like Anna, the victim known as Mya was also sexually abused by her father when she was a prepubescent minor. For Mya, the years-long abuse did not end when her father was arrested: "It continues, every day, only now I am experiencing abuse by nameless, faceless people who find gratification in the images of my abuse."  PSR, at 297.  Like Anna, Mya is "continually haunted by the knowledge that strangers are violating my privacy every day." PSR, at 298.  As Mya describes,

> Not only am I left living with extreme trust issues, I'm left physically, emotionally and mentally damaged. I cannot re-capture the innocence that was stolen from me. I cannot take away the images that are circulating on the internet or the dark web. I am powerless to stop or end the ongoing harm that continues, day after day, week after week, month after month, year after year. I am sickened by the appetite for images of my abuse. I am disgusted and discouraged and disheartened. Sometimes it feels like I'm only used for men's disgusting entertainment.  There is no justice for me and there is no escaping my situation.

PSR, at 299.

The defendant received six images of yet another minor victim's sexual abuse.  This victim, known as April, explains the impact on her:

> As a child I didn't have a choice what happened to me. Now, I have to suffer twice; the first time was being abused and the second time is the ongoing anxiety due to the images of my abuse forever accessible. It's impossible to cope with and accept

11

> that I have to live with the images of my abuse being available on the internet indefinitely. These images will live on the internet longer than I will live.

PSR, at 144.

For these victims, the trauma and pain endure long after the abuse itself stops. And while the defendant now admits to his conduct and accepts responsibility for his actions, the irreparable harm he has caused to the victims of his offenses nevertheless warrants a substantial term of incarceration.

### B.     The history and characteristics of the defendant

This defendant has a long, troubling criminal history, the majority of which involves a sexualized interest in children or is otherwise sexual in nature.[10] His encounters with law enforcement began in 2006, when he was convicted of indecent exposure. PSR ¶ 60. Just months later, he was arrested and convicted of peeping into an occupied dwelling. *Id.* ¶ 61. The defendant has posed a danger to his community as a result of his driving while intoxicated. *See id.* ¶¶ 62, 64. And he has multiple burglaries with disturbing fact patterns. *See id.* ¶¶ 63, 65, 66 (pulling the covers off of one of his burglary victims).

Moreover, and perhaps most relevant here, the defendant has preyed on children for over 15 years. In 2007, he broke into a residence, where a ten-year-old child resided, and tried to touch that child inappropriately. *See id.* ¶ 63. Given his apparent interest in children, it is notable that the defendant later sought to break into an elementary school to send his uncle an email because he "knows schools have internet." *See id.* ¶ 65 (defendant advised that he "freaked out" when his home internet went out while "trying to send his uncle an email" and thus "decided to break into

---

[10] Some of the defendant's convictions are not reflected in calculating his criminal history category given their age. *See* PSR ¶¶ 60-61. *See also* U.S.S.G. § 4A1.2(e)(3). But even without those convictions, the defendant still has a criminal history category of VI.

12

the school and use the internet"). And a decade ago, the defendant was already seeking out sexually explicit images of prepubescent minors. *See id.* ¶ 67. He printed out photographs of nude prepubescent children engaged in various sexual acts. For this, he pled guilty to possession of child pornography and served 5 years in prison. The defendant was on supervision for that offense when he committed this offense.

In fact, the defendant purchased the smartphone used to receive child pornography the day after he was released from jail for a parole violation. Almost immediately, the defendant accessed the internet to find and acquire child pornography images on his device. With a simple internet connection, and over the course of a short period of time, the defendant amassed a sizeable collection—"taboo" content as he described it, but which, in reality, depicted the violent rape of infants and toddlers. The defendant sought out this depraved content, apparently undeterred by his conditions of release—and by his prior conviction. That compulsion to fulfill his sexual desires, and his specific interest in minors, makes the defendant a continued threat to children.

### C. The need to promote respect for the law and to afford adequate deterrence to criminal conduct

Here, the mandatory-minimum sentence aligns with the low-end of the Guidelines range. A 180-month sentence is sufficient but not greater than necessary to deter the defendant and others from engaging in this conduct in the future. The defendant has already had his probation terminated and his parole revoked because of his violation. *See id.* ¶¶ 66, 67. As the government understands it, after the defendant's release from federal custody, the defendant will return to the custody of the Virginia Department of Corrections to serve approximately one-and-a-half years on the violation. *See also* U.S.S.G. § 5G1.3, Application Note 4(c) (recommending that the sentence for the instant offense be imposed consecutively to the sentence imposed for the revocation).

Moreover, in the federal system, the defendant is already statutorily subjected to a higher penalty given his prior conviction, and for good reason: His years-long conduct indicates an ongoing sexual interest in children and a disregard for their wellbeing and the law. As evidenced by the defendant's prior conviction and his criminal behavior on supervised release, the defendant poses a continued danger to children. His risk of recidivism is high. Thus, a significant sentence is necessary to deter the defendant from engaging in this dangerous and harmful conduct after he is released.

## V.    Supervised Release

The Court must also determine the appropriate term of supervised release at sentencing. "Supervised release . . . is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Under 18 U.S.C. § 3583(k), the authorized term of supervised release here is at least five years and up to life. This five-year mandatory minimum term reflects a heightened concern for recidivism among sex offenders and the need for supervision over time. *See, e.g.*, Lifetime Consequences for Sex Offenders Act of 2002, H.R. Rep. No. 107–527 at 2 (2002) ("[S]tudies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes [and that] . . . the recidivism rates do not appreciably decline as offenders age"); H.R. Conf. Rep. No. 108-66, at 49–50 (2003) (discussing how amendment to 18 U.S.C. § 3583(k) "responds to the long-standing concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders . . . whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison"). Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, *see* U.S.S.G. § 5D1.2(b)

(Policy Statement), and the Fourth Circuit has observed that § 3583(k) and 5D1.2(b) jointly "reflect[] the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public." *United States v. Morace*, 594 F.3d 340, 351 (4th Cir. 2010) (quotation marks and citations omitted).

For years, the defendant has engaged in behavior designed to hide his criminal activity, such as storing child pornography photographs underneath his dresser and failing to register his smartphone. His seeking out of child pornography—both in 2010 and 2022—was only discovered because of coincidental law enforcement intervention. *See* PSR ¶ 67 (search warrant unrelated to child pornography); *id.* (unannounced visit by his probation officer). That the defendant committed this offense while on supervision further demonstrates the need for continued, considerable supervision. It is apparent that the defendant needs significant intervention both to protect the public and to receive the treatment required for his successful rehabilitation. *See id.* ¶¶ 99-105. Accordingly, the United States respectfully recommends that the Court impose a lifetime term of supervised release with the conditions of supervision contemplated under 18 U.S.C. § 3583(d) and U.S.S.G. § 5D1.3(d)(7) for sex offenders required to register under the Sex Offender Registration and Notification Act.

## VI. Special Assessments under the Justice for Victims of Trafficking Act (JVTA) & The Amy, Vicky and Andy Child Pornography Victim Assistance Act (AVAA)

The Justice for Victims of Trafficking Act (JVTA) imposes a mandatory assessment of $5,000 on any non-indigent defendant convicted of, among other offenses, receipt of child pornography.[11] *See* 18 U.S.C. § 3014. While the statute is silent as to how to determine indigence,

---

[11] The money obtained from this assessment goes to the Domestic Trafficking Victims' Fund, which awards grants and enhances programming for victims of human trafficking and child pornography. The § 3014(a) assessment is payable after the defendant has satisfied all outstanding

courts have treated the imposition of this assessment like the imposition of other post-conviction assessments, where "[t]he defendant bears the burden of proving both his inability to pay at the time of sentencing and that he is not likely to become able to pay a fine upon his release from his term of imprisonment." *United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017) (internal citations and quotation marks omitted). Relevant factors to consider in this determination include a defendant's future earning potential, assets, educational background, employment history, age, and physical condition. *See United States v. McMiller*, 954 F.3d 670, 675 (4th Cir. 2020) ("[W]e agree with our sister circuits that a district court may consider a defendant's future earning potential when determining his ability to pay an assessment under 18 U.S.C. § 3014(a)." (citations omitted)); *see also United States v. Mann*, 770 F. App'x 649, 650 (4th Cir. 2019).

      Here, the PSR details the defendant's assets and liabilities and concludes that the defendant appears to unable to pay fines and the cost of incarceration or supervision. PSR ¶ 118. However, the defendant is young and physically capable of working following his term of incarceration. He has held a number of positions over the years and further stated that, prior to his incarceration, he had a net income of $1,600. *See* PSR ¶ 117. Under 18 U.S.C. § 3613, the liability to pay a fine or restitution shall terminate either 20 years from the entry of judgment or 20 years after the release from imprisonment, whichever is later. *See also United States v. Graves*, 908 F.3d 137, 141 (5th Cir. 2018). Thus, even if the defendant is unable to pay the assessment at the time of sentencing, this Court could find that the defendant is able to pay such an assessment in the twenty years following his release from imprisonment.[12] Accordingly, the United States respectfully requests

---

court-ordered fines, orders of restitution, and any other obligation related to victim compensation. *See* 18 U.S.C. § 3014(b) & (e).
[12] Those payments would amount to less than $21/month.

that the Court find the defendant non-indigent and impose the mandatory $5,000 special assessment under 18 U.S.C. § 3014.

On December 7, 2018, Congress enacted the Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA). The Act instructs that, in addition to any restitution or other special assessment, courts "shall assess not more than $35,000 on any person convicted of . . . [an] offense for trafficking in child pornography." 18 U.S.C. § 2259A(a)(2). Assessments collected under this statute are deposited in the Child Pornography Victims Reserve, which provides monetary assistance to victims of trafficking in child pornography, *see* 18 U.S.C. §§ 2259(d), 2259B, and shall be paid in full after any special assessment under 18 U.S.C. § 3013 and any restitution to victims of the defendant's offense, *see* 18 U.S.C. § 2259A(d)(2). In determining the amount to be assessed under 18 U.S.C. § 2259A, courts should consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and the guidance in 18 U.S.C. § 3572 for the imposition of fines. *See* 18 U.S.C. § 2259A(c). The United States respectfully requests that the Court impose a reasonable special assessment under 18 U.S.C. § 2259A, in addition to the $100 mandatory special assessment for his felony conviction pursuant to 18 U.S.C. § 3013.

**VII.    Restitution**

Pursuant to 18 U.S.C. §§ 2259 and 3663, the defendant must pay restitution in the "full amount of the victims' losses as those losses are defined by Section 2259(c)(2)." PSR ¶ 12. *See also Paroline*, 572 U.S. at 458 ("[A] court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses."). As part of the plea agreement entered into by the parties, the defendant has agreed that restitution is mandatory under § 2259 and that the Court must enter restitution in an amount not less than $3,000 per victim. *Id.* The defendant has also agreed that the Court may

17

defer the imposition of restitution until after sentencing and to waive the requirement under 18 U.S.C. § 3664(d)(5) that the Court determine a final restitution amount no later than ninety days after sentencing. *Id* at ¶ 14.

The government has received seven restitution requests at this time. The government and the victims' attorneys are still attempting to reach an agreement with the defendant about the restitution to be ordered in this case. The government anticipates that a restitution agreement will be reached in this case at the time of sentencing. In the event the parties are unable to reach such an agreement, the government will separately brief or otherwise address the restitution claims with this Court.

## VIII.   Forfeiture

On October 26, 2022, the Court entered a Consent Order of Forfeiture forfeiting a Samsung cellular telephone (IMEI 350207639951257) to the government. Dkt No. 30. Pursuant to Fed. R. Crim. P. 32.2(b)(4)(B), the United States respectfully requests that the Court include the forfeiture order, directly or by reference, in the judgment.

## CONCLUSION

For the reasons above, the United States respectfully requests that the Court impose a sentence of 180 months' imprisonment, a lifetime term of supervised release, a $100 special assessment pursuant to 18 U.S.C. § 3013, a $5,000 special assessment pursuant to 18 U.S.C. § 3014, and a reasonable special assessment under 18 U.S.C. § 2259A.

Respectfully Submitted,

Jessica D. Aber
United States Attorney

By:     /s/
Rachel L. Rothberg
Special Assistant United States Attorney (LT)
Laura D. Withers
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
Email: Rachel.Rothberg2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing ("NEF") to counsel of record in this case.

I further certify that on February 16, 2023, I sent a copy of the foregoing via electronic mail to counsel of record and the U.S. Probation Officer assigned to this matter:

Teneisha Smith
United States Probation Office
Email: Teneisha_Smith@vaep.uscourts.gov

Respectfully submitted,

/s/
Rachel L. Rothberg
Special Assistant United States Attorney (LT)
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 299-3700
Fax: (703) 299-3980
Email: Rachel.Rothberg2@usdoj.gov