IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:22-CR-151 |
| | ) | |
| Jonathan Peter Miller | ) | Hon. Patricia Tolliver Giles |
| Defendant. | ) | |
| _____ | ) | Sentencing: February 23, 2023 |

## MR. MILLER'S POSITION ON SENTENCING

Mr. Miller, through counsel, submits that a sentence of 15 years' incarceration followed by a term of supervised release serves the goals of sentencing for the following reasons:

*First*, the parties' joint recommendation of 15 years—driven by the mandatory minimum—is within or above a guideline range that has come under increasing scrutiny for its elevated sentencing recommendations. There is no need to add time to this already lengthy sentence.

*Second*, Mr. Miller's sentence of incarceration will be particularly punitive due to his physical build, ███████████, and the nature of his charge. The goals of punishment, as well as the seriousness of the offense, are served by a 15 year sentence.

*Third*, Mr. Miller will be well over 50 years old when released and, per statistics, markedly less likely to recidivate. With the continued support of his family,

1

as well as his first period of supervision with a federal probation officer, Mr. Miller can benefit from a period of supervised release with treatment.

    I.    *While the section 2G2.2 guidelines are an imperfect proxy for culpability, the mandatory minimum in this case requires a guideline or above guideline sentence of 15 years.*

As will be discussed further below, Mr. Miller's offense conduct was not technologically advanced, nor particularly aggravated. However, as enhancements intended to distinguish among cases under this guidelines section apply generally across the board, the recommended guidelines are high, and encompass the 15 year joint recommendation of the parties. While Mr. Miller objects to the image count in the Pre-Sentence Report ("PSR"), the jointly recommended 15 year sentence is required regardless of the guidelines range, so the Court need not resolve the objection. *See* Fed. R. Crim. P. 32(3)(B).

    A. *The offense.*

Mr. Miller makes no excuses for his behavior and has accepted responsibility for his conduct. Undoubtedly child pornography is reprehensible and possessing and viewing it is wrong. However, it is important to note that the offense conduct in this case was not that of a technologically savvy collector, and that Mr. Miller's acceptance of responsibility began on the date of his arrest.

Here, the illegal pornography was found on a smartphone, in both open internet tabs, and cached duplications of internet pages and their contents, that were either open or had been previously accessed. ECF 32 at 7-9. Mr. Miller only used the smart phone to access the prohibited pornography for 9 days. Many of the images

were accessed through google. *Id*. There is no evidence that Mr. Miller ever accessed the dark web or entered into chatrooms or other groups related to child pornography. He did not use a peer to peer software program, or a VPN, or any other advanced technology. He did not knowingly save the illegal pornography to a folder or hard drive, and he never advertised or distributed it. In the end, the course of conduct in this case was unsophisticated, occurred over a very short period, and was non-aggravated.

What is more, from the moment of discovery, Mr. Miller accepted responsibility for his acts. When his probation officer saw an unregistered phone, he immediately gave her permission to search the device, even providing the code to unlock the phone. ECF 32 at 8. Further, he provided state detectives with consent to search his phone and gave a voluntary interview to them, making incriminating admissions. *Id*. at 8-9.

Since that time, Mr. Miller has pled guilty to the most serious count charged, further accepting responsibility for his actions. Given his record, which will be further addressed below, Mr. Miller is facing a significant 15 year sentence. But the actual course of conduct in this case, was non-aggravated and certainly not savvy, and the Court should accept the parties' joint recommendation of 15 years.

> B. *The child pornography guideline is not entitled to the usual deference due to other guidelines sections.*

Both the judicial and legal communities have recognized that the child pornography guideline, U.S.S.G. § 2G2.2, is significantly flawed. Like the crack-cocaine guideline, this guideline section is not based on an empirical study by the

Sentencing Commission. *See United States v. Helton*, 782 F.3d 148, 158 (4th Cir. 2015) (J. Gregory concurring); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 702 (S.D.W. Va. 2009); *see also*, Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (January 1, 2009). Specifically, enhancements in these provisions drive up the advisory guidelines ranges such that the enhancements intended to distinguish one case from another apply in cases across the board.

For example, in this case, the PSR has applied an enhancement, the computer enhancement, for Mr. Miller's use of a smartphone. ECF 32 at 12. While there may have been a time when this pornography was not accessed electronically, even the Sentencing Commission has recognized that computers are so ubiquitous in this day and age that the enhancement has lost its utility for distinguishing between severity of offense conduct. *See* USSC, Federal Sentencing of Child Pornography Non-Production Offenses at 4 (June 2021) ("USSC Non-Production Offenses Report"); USSC Federal Sentencing of Child Pornography: Production Offenses at 20 (October 2021);[1] *See also, e.g.*, *United States v. R.V.*, 157 F. Supp. 3d 207, 225-237 (E.D.N.Y. 2016) (containing extensive discussion of effect of computer revolution on child pornography cases in case involving similar facts). Per the Sentencing Commission's 2021 Non-Production Offense report, the computer enhancement applied in nearly 95

---

[1] Reports available at Federal Sentencing of Child Pornography: Non-Production Offenses (ussc.gov) and Federal Sentencing of Child Pornography: Production Offenses | United States Sentencing Commission (ussc.gov) (last visited Feb. 16, 2023).

4

percent of non-production cases. USSC Non-Production Offenses Report at 4; *see also*, *United States v. McMiller*, 954 F.3d 670, 673 (4th Cir. 2020) (where the district court eliminated two offense levels because the use of a computer was "something that is present in every [child pornography] case.").

Here, the computer enhancement adds 2 points to the total offense level in the PSR. Without this enhancement, the final offense level, notwithstanding Mr. Miller's objection to the PSR, would have been a 28 with a recommended guidelines range of 140 to 175 months. This is an over 2 year difference in a recommended sentence for use of technology, in a case which as discussed above, was not the product of a technologically savvy individual.

Additionally, the PSR applies a 5 point enhancement for the number of images, counting the GIFs as videos and weighing the videos more heavily than still images. ECF 32 at 12. This proliferation of digital images, whether still, GIFs, or video, means that like the computer enhancement, the number of images no longer meaningfully distinguishes more serious conduct from less serious conduct. *See* USSC Non-Production Offenses Report at 19 (showing number of images enhancement applied in more than 95 percent of CP possession cases). In the Sentencing Commission's recent study, the key findings focus on the sheer numerosity of images and videos given current technology and recognizes that this diminishes the enhancement's usefulness in distinguishing between offenders. *See* USSC Non-Production Offenses Report at 4.

5

Similarly, two other enhancements applied to Mr. Miller's final offense level, material involving a minor under 12 (adding two points) and sadomasochistic images (adding 4 points), are applied in most cases. *See* U.S. Sentencing Comm'n, Report to Congress: Child Pornography Offenses (December 2012) at 123 (explaining in 2010, §2G2.2(b)(2) (images depicting pre-pubescent minors) applied in 96.1 percent of cases; §2G2.2(b)(4) (sadomasochistic images) applied in 74.2 percent of cases)[2]. Regardless of the guidelines, this Court must impose at least a mandatory minimum 15 year sentence. That said, the fact that a 15 year sentence is within or above the recommended guidelines, that are not based on empirical evidence and fail to distinguish between defendants, indicates the Court should not add any time to the required 15 year sentence.

C. *Objections to the PSR.*

As an initial matter, should the Court sustain Mr. Miller's objection to the PSR, the recommended guidelines would be 140 to 175 months, or if the Court awarded a 4 level enhancement for the number of images (verses 3 or 5), the final guidelines would yield a range 151 to 188 months. If the Court denied the objection, the guidelines remain at 180 to 210 months. Regardless of Mr. Miller's objection, the joint recommended sentence of the parties is within or above the applicable guideline range, therefore the Court need not resolve the objection to fashion a sentence in this case. *See* Fed. R. Crim. P. 32(3)(B).

---

[2] Available at: Mandatory Minimum Penalties for Sex Offenses in the Federal Criminal Justice System (ussc.gov) (last visited Feb. 16, 2023).

Nonetheless, Mr. Miller objects to the double counting of images. Mr. Miller accepts the government's representation that the web pages were not included in the image count. However, the phone cached images in three separate folders. According to the government, there were 259 unique images and 106 duplicates, ECF 32 at 29, found in these three folders. None of these folders were created by Mr. Miller. There is no evidence that Mr. Miller ever accessed these folders or knew of their existence.

According to the government's forensic report, google chrome had three folders where images, or even entire web pages were saved or cached. Each of these folders obtained data from either open web pages or previously accessed web pages. Specifically, the report showed, a "data cache" folder created by google chrome stored images and videos; a google chrome "cache offline page folder" stored entire web pages, including animations and images; and an "app_textures" folder also created by google chrome stored thumbnail images from open internet tabs. The replication of images or GIFs in these folders is the double counting Mr. Miller objects to.

Here, the images in the cache folders are a proxy for what Mr. Miller saw on the internet. If technology caused an image Mr. Miller viewed to be saved multiple times to the same folder, or multiple times in separate folders, this duplication of images should not be added to the total image count. That is, without verification that the 106 duplicative images were not the product of a device storing the same image in multiple folders (or the same folder), the duplicative images should not be counted.[3]

---

[3] For example, in the case of the GIFs they could have been counted multiple times.

Furthermore, the government's reliance on *Price* is misplaced. In *Price*, the defendant reproduced the same illegal image when he emailed the image to a large number of people. *United States v. Price*, 711 F.3d 455, 459 (4th Cir. 2013). As the *Price* court reasoned, "[t]hat Price reproduced the pornographic images with the click of a 'send' button as opposed to the use of a photocopier does not sway the outcome; his conduct still had the effect of increasing the number of images of child pornography." *Id*. In *Price,* the defendant knowingly duplicated child pornography and his conduct had the actual "effect of increasing the number of images of child pornography." *Id*. That is not the case here. Knowing reproduction is very different that unknown caching by technology. For these reasons, Mr. Miller submits the image count should be the 259 distinct images.

Finally, Mr. Miller objects to the classification of a GIF as a video, and the 75 image count assessed to each GIF (for a total of 1,650 images). Per the Encyclopedia Britannica, a GIF, or a graphics interchange format, is a digital file format developed as a means of reducing the size of images and to create short animations.[4] GIFs tend to show a looping graphic and "unlike a video a file size is small." Isabel Roy, *What GIF Stands for and How to Pronounce it?* Reader's Digest (Jan 24, 2023).[5] That GIFs

---

The GIF could be saved as an image in the App texture folder, or as an image in the offline page cache folder, or the data cache folder. In that case, the GIF, is first counted separately, as a video (or not), and then double counted, maybe even triple counted as an image in one the cache folders where it also appears.

[4] Available at: GIF | Definition, Meaning, & Facts | Britannica (last visited Feb. 16, 2023).

[5] Available at: What Does GIF Stand for and How to Pronounce It? | Reader's Digest (rd.com) (last vistied Feb. 16, 2023).

8

tend to be smaller than videos is significant here. When the government combined all 22 GIFS, the resulting play time was approximately 3 minutes and 14 seconds. If Mr. Miller had a single video of that length, he would be assessed 75 images. If he had a longer video, a video of up to five minutes, he would be assessed 75 images. Here, the short nature of the GIFs is demonstrative of the inequity of treating them as videos and applying a 75 image assessment to each one.

    II.    *For a man like Mr. Miller, prison will be extra punitive.*

        A. *Since birth, Mr. Miller has been physically small and developmentally lagging, and he developed early signs of mental health disorders and substance addiction.*

The youngest of four siblings, Mr. Miller was born premature and from birth showed signs of developmental struggles, including hearing impairment. Exhibit 2, Psychological Evaluation of Dr. Travis Flower, at 2; Exhibit 1, Character Letters. As a baby, he suffered from a hormone deficiency, and went through treatment and a study at the National Institutes of Health. Exhibit 2 at 2. Mr. Miller was slow to speak and a very rigid child. *Id*. Born very small, as his older brother wrote in his letter to the Court, Mr. Miller never grew like his siblings and "seemed to be born at a disadvantage physically and mentally." Exhibit 1.

At a young age, Mr. Miller's parents divorced. The separation was contentions and described by Mr. Miller's older brother as "devastating". ECF 32 at 19; Exhibit 1. Ms. Hourigan, the second wife of Mr. Miller's father, noted that all the Miller children were "angry and despondent over their parents' divorce[,]" and were "frequently used as pawns in their parents' continuing battles." Exhibit 1. After the divorce, the

9

children went between their parents' two houses. Mr. Miller's mother and father both remarried quickly. Exhibit 1. His mother married a man who accepted a job in New Jersey. *Id*. As a result, the children were often left unsupervised at their mother's house. *Id*. This lack of supervision during Mr. Miller's formative years was problematic, ███████████████████████████████████ and substance abuse problems, both of which are generationally present in his family.

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████ ███████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████████

████ Mr. Miller began using both alcohol and drugs at a very young age. *See* ECF 32 at 22; Exhibit 2 at 4; Exhibit 1. By his early teens, he was a regular drinker and even drank alcohol with his mother, Exhibit 2 at 2, and his older siblings. Both Mr. Miller and Dr. Flower note that the abuse of alcohol ████████████████ ███████████████████████████ ███████████████████ ████████████████████████████. Dr. Flower understands that Mr. Miller used alcohol to self-soothe and mitigate ██████████████████████ ██████████████████████.



Though Mr. Miller struggled in school, he graduated high school, and has worked a variety of jobs over the years. ECF 32 at 23-24. He has also spent large portions of his adult life in custody. Through it all, he has remained close to his siblings. His brothers and sister all acknowledge the severity of Mr. Miller's offense conduct yet remain supportive and loving. *See* Exhibit 1. In their letters to the Court, they note the love and kindness they see in their brother, often expressed through the poems he writes to share his compassion for others. Exhibit 1. They also describe his short stature, and his struggles with substance abuse ▬▬▬▬▬▬. *Id*. Poignantly, one of Mr. Miller's older brothers, who is now a parent, wrote "looking back [at] the relationship with Jonny I now realize that it has always had more of a paternal dynamic than as sibling." *Id*.  Mr. Miller has always needed his siblings to look out for him, because he "seemed to be lacking the things needed to be successful and safe." *Id*.

11

B. *Prison will be especially punitive for Mr. Miller.*

Mr. Miller's physical stature, his count of conviction, ███████████ all makes the prison environment a uniquely harsh experience for him. As the Bureau of Prisons ("BOP") recognizes, sex offenders are "a vulnerable population within a prison setting." Federal Bureau of Prisons, Custody and Care, Sex Offenders.[6] Those convicted of sex offenses are often the targets of violence and extortion. *See* Walter Pavlo, *Federal Bureau of Prisons' Misclassification of Inmate Leads to Compassionate Release*, Forbes (Aug. 17, 2021)(detailing a compassionate release grant based on an individual's misclassification as a sex offender resulting in threats and physical abuse).[7]

At 5 feet 3 inches, weighing very little, ECF 32 at 21, Mr. Miller's small stature has always led to a lack of confidence. Exhibit 1. This coupled with his count of conviction makes him a target in the custodial setting. *See* Exhibit 2 at 8. During his last period of incarceration Mr. Miller reported 8 physical assaults. Exhibit 2 at 3. The reality that Mr. Miller will face physical threats during the years he spends in prison is singularly harsh, and a punishment not accounted for in the guidelines.

████████████████████████████████████████████████
████████████████████████████████████

---

[6] Available at BOP: Sex Offenders (last visited Feb. 16, 2023).
[7] Available at Federal Bureau Of Prisons' Misclassification Of Inmate Leads To Compassionate Release (forbes.com) (last visited Feb. 16, 2023).



Mr. Miller's physical attributes, ████████████████, and his count of conviction will add to the harshness and punitive nature of any sentence he will serve. His family and friends have witnessed this in years past. As Ms. Hourigan wrote in her letter to the Court, she spoke to Mr. Miller occasionally, during his last period of incarceration "but it was difficult to penetrate his reserve under those circumstances." Exhibit 1.

    III.   *A sentence of 15 years is sufficient but not greater than necessary to serve the goals of sentencing.*

        A.  *The goals of deterrence, the need to protect the public, and the need to avoid unwarranted sentencing disparities are served by a 15 year sentence.*

Mr. Miller acknowledges both his criminal history and the fact that he was on supervision when this offense occurred. His criminal history is accounted for in both the mandatory minimum (triggered because of a prior conviction) and the criminal

history category points (as is the fact that he was on supervision at the time of this offense). That is, the parties' joint recommendation of the mandatory minimum, within or above the applicable guideline range, is based in part on Mr. Miller's criminal history.

And, significantly, Mr. Miller is 43 years old, almost 44. ECF 32 at 3. With a 15 year sentence, he will be a few years shy of 60 when released to begin his term of supervised release. That Mr. Miller will be older when released from this Court's sentence, is associated with very low risks of recidivism. Generally speaking, recidivism rates decline with age. *See* USSC, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, Ex. 9 (2004) [8] For sex offenses specifically, research has shown that sexual criminal behavior declines with age, Michael Lasher & Robert McGrath, Desistance from Sexual and Other Violent Offending Among Child Sexual Abusers, 20 Crim. Justice & Behav. 1 (2016), with study after study finding that individuals 50 years and older have "low base rates" of sexual recidivism. *See e.g.* Terry Nicholaichuk *et al.*, Age, Actuarial Risk, and Long-Term Recidivism in a National Sample of Sex Offenders, 26 Sexual Abuse: A Journal of Research and Treatment 406 (2014); Jan Looman & Jeffrey Abracen, Comparison of Measures of Risk for Recidivism in Sexual Offenders, 25 J. of Interpersonal Violence 781, 803 (2010)( "[A]ge at release was found to be associated with sexual recidivism, with offenders above the age of 50 reoffending at a very low rate."); Karl

---

[8] Available at: Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines - May 2004 (ussc.gov) (last visited Feb. 16, 2023).

14

Hanson et al., High-Risk Sex Offenders May Not Be High Risk Forever, 29 J. of Interpersonal Violence 2792, 2797 (2014) ("The initial five year recidivism rate for persons 50 or older at the time of release were significantly lower than those under 50. After 5 years, the risk of recidivism for all individuals was low.")

Further, evidence indicates "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment." National Institute of Justice, *Five Things About Deterrence* (Sept. 2014).[9] Adding time to an already long prison sentence—here 15 years—has "minimal or no benefit on whether offenders or potential offenders commit crimes." Brennan Center for Justice, *What Caused the Crime Decline?* (Feb. 2015).[10] Indeed, even among repeat offenders, like Mr. Miller, there is no evidence that tougher sanctions result in increased deterrence. *See* Daniel Mears & Joshua Cochran, *Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of Different Types of Sanctions*, J. of Research in Crime & Delinquency 24 (2017) ("Put differently, little evidence exists that a 'recidivist sentencing premium' reduces recidivism.").

Finally, a sentence longer than 15 years would create an unwarranted disparity. In *United States v. Christopher James Tator*, 18-CR-294 (TSE), the defendant, Mr. Tator, was convicted of receipt, and was downloading, storing, and

---

[9] Available at: Five Things About Deterrence (ojp.gov) (explaining while "[p]risons are good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crimes. Prisons actually may have the opposite effect.") (last visited Feb. 16, 2023).
[10] Available at: What Caused the Crime Decline? | Brennan Center for Justice (last visited Feb. 16, 2023).

accessing child pornography, " a large volume of which suggests a particular interest in infants." ECF 26. Unlike Mr. Miller, Mr. Tator utilized peer to peer software—making his trove of pornography available to others, had three devices containing child pornography, and used wiping software. *Id.* Mr. Tator had prior convictions for two counts of attempting to take indecent liberties with children and a conviction for failure to register as a sex offender. *Id.* In that case, the Court issued a 15 year sentence, at the low end of the applicable guideline range. ECF 27.

In *United States v. William Tupi*, 09-CR-44 (GBL), Mr. Tupi who had a prior conviction for attempting to purchase child pornography, and a prior arrest for child pornography that resulted in a plea to disorderly conduct, did not face a recidivist enhancement. ECF 17. He pled to receipt and with guidelines of either 135 to 168 or 108 to 135 (the record is not clear), he received a variant sentence of 84 months. ECF 20. These cases show that defendants with similar or worse conduct, and prior sex related offenses received a sentence comparable to what Mr. Miller seeks, or less.

> B. *The Court should impose no more than the mandatory restitution and the $100 special assessment in this case.*

Mr. Miller objects to the imposition of both the $5,000 special assessment contemplated by 18 U.S.C. § 3014(a) and the special assessment under §2259A. Per the plain language of the statute, § 3014 is not to be assessed on "indigent" persons. 18 U.S.C. § 3014(a). When considering where an individual is indigent under, § 3014 courts look at an individual's current ability to pay and their future earning potential. *United States v. McMiller*, 954 F.3d 670, 675 (4th Cir. 2020). Factors relevant to a future earning potential may include financial resources and assets, financial

16

obligations, projected earnings, other possible sources of income, age, education, health, dependents, and work history. *See id.* at 674.

Here, there is no doubt that Mr. Miller is currently indigent. He was deemed indigent when the Federal Public Defender was appointed to represent him. He has no assets, other than a small bank account controlled by his sister, ECF 32 at 24, and he has been in custody and unable to earn money for close to a year, since April of 2022, ECF 32 at 1.

Mr. Miller will also be indigent when released from his sentence of incarceration. When released Mr. Miller will likely be over 50, closer to 60 years old, and a registered sex offender. Both his age and his status as a sex offender will make it more difficult to find employment. Further, he has no higher education degree, a fact that will further limit his employment opportunities. *See McMiller*, 954 F.3d 670 at 674 (noting the defendants master's degree contributed to finding that he could pay assessment in the future). Nor does Mr. Miller have assets to sell to support himself in the future. *See United States v. Lail*, 736 F. App'x 381, 382 (4th Cir. 2018)(unpublished)( finding no error in imposition of the special assessment where the defendant planned to sell his him valued at a minimum of $74,500).

Although Mr. Miller has worked hard in the past to maintain employment, ECF 32 at 23-24, prior to his incarceration, he was only making about $1,600 a month which is approximately $19,200 a year assuming he had continuous employment, which he did not. *See id.* at 24. Even putting aside the interruption of employment due to incarceration, Mr. Miller's work history has been unstable due to his status as

17

a sex offender and housing instability. *Id*. at 23. For this reason, Mr. Miller's likely income while in the community was close to or less than the poverty line threshold, of $14,580, for a single individual in 2022. U.S. Department of Commerce Bureau of the Census, Preliminary Estimate of Weighted Average Poverty Threshold for 2022.[11] If Mr. Miller's current earning ability is a metric for the future, he will be indigent in when released from prison as an older individual. Finally, although the numbers have not been finalized, at minimum, Mr. Miller will be required to pay $21,000 in restitution. Pursuant to § 3014(f), Mr. Miller must make his restitution obligation a priority. This means that any possible excess future income will be needed for restitution payments.

The Court should also not impose the special assessments contemplated by 18 U.S.C. § 2259A. That statute provides that the Court must consider the factors in sections 3553 and 3572 when determining the amount of this assessment. *See* § 2259A(c). Here, the amount should be zero because, again, Mr. Miller is indigent, and will most likely remain indigent when he is released. Further, imposing these assessments would only limit Mr. Miller's ability to pay restitution to identified victims in this case. *See United States v. Sanders*, No. 3:21CR-80-RGJ, 2022 WL 1493858, at *2 (W.D. Ky. May 11, 2022) (imposing no assessment pursuant to § 2259A due to finding that defendant will be unable to pay a fine or special assessment, and because "restitution is more important in this case than the imposition of a fine"); *United States v. Hyatt*, 572 F. Supp. 3d 576, 586 (N.D. Ind. 2021), overruled on other

---

[11] Available at: Poverty Thresholds (census.gov) (last visited Feb. 17, 2023).

grounds, 28 F.4th 776 (7th Cir. 2022) (finding that imposition of an assessment pursuant to § 2259A would impair defendant's ability to pay restitution).

IV. Conclusion

For the above stated reasons, the defense respectfully requests that this Court impose a sentence of 15 years, a term of supervised release, and recommend that Mr. Miller be designated to FCI Seagoville or FMC Devens so that he can participate in the in-patient sex offender rehabilitation program.

Dated: February 17, 2023

Respectfully Submitted,

/s/ Lauren E. S. Rosen
Lauren E. S. Rosen
VA Bar No.: 98540
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800
(703) 600-0880 (fax)
Lauren_Rosen@fd.org